UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA                    CIVIL ACTION NO. 69-14429

VERSUS                                       JUDGE ROBERT G. JAMES

MOREHOUSE PARISH SCHOOL BOARD,    MAG. JUDGE KAREN L. HAYES
ET AL.

RULING

The United States of America originally brought this desegregation action in 1969.
Beginning on August 1, 1969, the Morehouse Parish School Board ("the School Board") operated
under "Findings of Fact, Conclusions and Decree" ("1969 Decree") [Doc. No. 60] , with occasional
amendments, over the next forty-three years.  On March 29, 2012, the Court entered an Agreed Order
[Doc. No. 79] finding that the School Board operated a unitary school district with regard to the
*Green* factors of extracurricular activities and facilities.  *See Green v. Cnty. Sch. Bd. of New Kent
Cnty.*, *Va.*, 391 U.S. 430 (1968).

Pending before the Court is a Motion for Declaration of Unitary Status [Doc. No. 90] filed
by the School Board.  The School Board contends that it should now be declared unitary in the
remaining areas of operation: teacher and staff assignment, transportation, and student assignment.
The United States does not oppose the motion.

I.      LAW AND ANALYSIS

        A.      Desegregation Law

When first presented with a school desegregation case, a district court is charged with

determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. CONST., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, 391 U.S. at 437-38.

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

The goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments. *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991). The district court may find that a school board has reached partial unitary status on one or more factors. *Freeman*, 503 U.S. at 489.

"The District Court should address itself to whether the Board had complied in good faith

with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 at 249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225. To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir.1971). Once the Court determines that the facts reveal no continued racial discrimination and the school board's good faith to maintain such non-discriminatory practices, it may declare the subject area unitary. *See Freeman*, 503 U.S. at 490-91; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.") .

### B.     The *Green* Factors

#### 1.     Teacher and Staff Assignments

The 1969 Decree included a provision requiring that the assignment of teachers and staff who work directly with children be in such a manner so that "in no case will the racial composition of the staff indicate that a school is intended for Negro students or white students." [Doc. No. 60]. To assist in reaching that goal, the Court ordered that the ratio of black to white teachers and other staff who work directly with children be "substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." *Id.*

The School Board has overseen the administration and enforcement of these provisions. It has adopted and implemented policies and procedures consistent with these directives. Additionally, the School Board has demonstrated non-discriminatory hiring and assignment practices

in the area of staff assignments.  As the United States noted in a recent status report [Doc. No. 75],

"the District's faculty assignments during the 2010-2011 school year complied with the Orders in

this case."  Similar teacher and staff assignments were made for the 2011-2012 and 2012-2013

school years.

The Court finds that the School Board has effectively eradicated any vestige of past

discrimination with regard to teacher and staff assignments and has consistently maintained and

implemented such non-discriminatory policies and practices for many more than the requisite three

(3) years necessary to demonstrate it has attained unitary status in that area of operation.  Therefore,

the School Board is declared unitary in the area of faculty and staff assignments.

### 2.      Transportation

With regard to transportation, the 1969 Decree mandated as follows:

> Bus routes and the assignment of students to buses will be designed
> to [e]nsure the transportation of all eligible pupils on a non-
> segregated and otherwise non-discriminatory basis.

[Doc. No. 60].  Valid objections to a transportation plan may rise "when the time or distance of

travel is so great as to either risk the health of the children or significantly impinge on the

educational process."  *Swann,* 402 U.S. at 30-31.   The Court must weigh the soundness of any

transportation plan in light of these concerns as well as general desegregation concerns.

The School Board has continuously and purposefully implemented unitary transportation

policies for more than the past three years.  Under those policies, there are no dual routes (and have

not been for many years).  All students who are eligible are provided free school bus transportation

to and from school, regardless of how far or close they live to the school which they attend.  Those

students who request majority-to-minority transfers are, likewise, transported to their requested

schools.

Students are assigned and transported according to a geographically feasible route schedule that affords the most integration possible given the geographical and time limitations. Of the eighty-six bus routes, there are six bus routes which transport students of only one race. However, those routes are based only on the demographic living patterns of the students and the feasibility of transportation, not based on discriminatory purposes.

The Court finds that the School Board has operated and continues to operate its system-wide transportation program in a unitary manner, with no vestige of past discrimination remaining in that area of operation. It has adhered to its non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the School Board is unitary in the area of transportation.

### 3.      Student Assignments

In the past forty-four years, the student assignment plan has been amended on several occasions. Most recently, in 2010, based on analysis performed by an expert retained by the United States, a student assignment plan was adopted by Agreed Order. [Doc. Nos. 59 & 65]. Since that time, the School Board has operated under and complied with the provisions of the Agreed Order. As required, the School Board filed a lengthy compliance report on January 10, 2013 [Doc. No. 87], which the Court has fully considered and adopts herein.

While all schools in the District are not completely racially balanced, the law does not require such a prerequisite to a unitary status finding. *See Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008). As the Fifth Circuit has explained,

> [t]he  constitution  does  not  require  school  districts  to  achieve  maximum

desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally.  The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.  The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance.

*Monteilh v. St. Landry Parish School Bd.*, 848 F.2d 625, 632 (5th Cir. 1988) (internal quotations and citations omitted).  The Court need not employ "'awkward,' 'inconvenient,' or 'even bizarre' measures . . . to achieve racially balanced school assignments 'in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces.'" *Hull v. Quitman Cnty. Bd. Of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) (quoting *Freeman*, 503 U.S. at 493).

A review of the record and the Court's knowledge of this case indicates that the factors affecting racial balance are those of geography and demographic housing patterns, not vestiges of the prior *de jure* system.  Given the School Board's consistent application of non-discriminatory student assignment policies and practices for many more than the requisite three years, the Court finds that the School Board has achieved unitary status in the area of student assignments.

## C.     Good Faith

The Court's findings above with regard to the *Green* factors constitute outward signs of the School Board's commitment to its students, employees, the public, and to this Court that it has, in good faith, erased all traces of prior discrimination.  Having fully reviewed the submission of the School Board, the Court also finds that it has demonstrated its good faith commitment to the entirety of the desegregation plan, so that the students, parents, and public have assurance that further injuries or stigma will not occur.

## II.      CONCLUSION

For the foregoing reasons, the School Board's motion is GRANTED.  The Court finds that the School Board has demonstrated that it has achieved unitary status in the remaining areas of teacher and staff assignments, transportation, and student assignments; has exhibited good faith in achievement and maintenance of such non-discriminatory programs; and is prepared, willing, and ready to move forward in a constitutionally consistent manner without direct judicial supervision. The permanent injunction previously entered is DISSOLVED, and the Court will end its direct supervision of the School Board.  This matter is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 4th day of March, 2013.


_____

**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**